******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DARBY FOX *v.* RODMAN FOX
(AC 33354)

DiPentima, C. J., and Alvord and Bear, Js.

*Argued January 7—officially released September 9, 2014*

(Appeal from Superior Court, judicial district of Stamford-Norwalk, Hon. Dennis F. Harrigan, judge trial referee [dissolution judgment]; Hon. Kevin Tierney, judge trial referee [motion to modify].)

*Charles D. Ray*, with whom, on the brief, was *Lee Friend Lizotte*, for the appellant (defendant).

*Samuel V. Schoonmaker IV*, with whom, on the brief, was *Wendy Dunne DiChristina*, for the appellee (plaintiff).

*Opinion*

BEAR, J. The defendant, Rodman Fox, appeals from the judgment of the trial court rendered in favor of the plaintiff, Darby Fox, on her postjudgment motion to modify child support. The defendant claims that the trial court erred by (1) basing its modified child support calculations on his imputed income and not on the minor children's demonstrated needs, in violation of *Maturo* v. *Maturo*, 296 Conn. 80, 995 A.2d 1 (2010), and the child support guidelines, as set forth in § 46b-215a-1 et seq. of the Regulations of Connecticut State Agencies (guidelines); (2) awarding attorney's fees to the plaintiff; (3) imputing a rate of return on his investment income that lacked evidentiary support; and (4) ordering him to make child support payments previously made from the minor children's custodial and trust accounts, pursuant to the parties' separation agreement. We agree with each of the defendant's claims and thus reverse the judgment of the trial court.

We agree with the defendant as to his first claim because the court began its calculation of his modified child support obligation with his imputed income and used his imputed income throughout its calculation. Instead, pursuant to *Maturo* and the guidelines, the court should have begun its calculation with the defendant's actual income and then determined whether the resultant amounts were inappropriate or inequitable, thus justifying a deviation from those amounts by performing another calculation, this time using his imputed income. We also agree with the defendant as to his second claim because both parties have substantial liquid assets, and the court made no finding that a failure to award attorney's fees to the plaintiff would have undermined its other financial orders.

Even though our resolution of the defendant's first and second claims is dispositive of the present appeal, for the reasons more fully stated, respectively, in parts III A and B of this opinion, we nonetheless address the defendant's other claims because "these issues are likely to arise again on remand and are adequately briefed." *Kortner* v. *Martese*, 312 Conn. 1, 5, 91 A.3d 412 (2014). We agree with the defendant as to his third claim because the evidence did not support the rate of return that the court imputed on his investment income. Finally, we agree with the defendant as to his fourth claim because the court's termination of the separation agreement provision allowing him to pay part of his child support obligation with the minor children's custodial and trust accounts did not correspond to the substantial changes in circumstances it had found, all of which pertained only to the parties' respective assets and incomes.

The following facts and procedural history are relevant to our resolution of the present appeal. The parties

married on March 11, 1989. They have four children: Alexandra, who reached the age of majority in 2008; Jacqueline, who reached the age of majority in 2009; Timothy, who reached the age of majority in 2011; and John, who presently is seventeen years old. The court, *Hon. Dennis F. Harrigan*, judge trial referee, dissolved the parties' marriage on November 30, 2005. The judgment incorporated by reference the terms of a written separation agreement that delineated, inter alia, the parties' alimony, child support, parenting, and property division arrangements.

Three paragraphs of the separation agreement are at issue in the present appeal. The first two paragraphs are part of article III, entitled "Child Support." Specifically, article 3.1 provides: "Commencing December 1, 2005, the [defendant] shall during his lifetime pay the [plaintiff] the sum of ONE THOUSAND TWO HUNDRED FIFTY . . . DOLLARS per month per child for their support. The [defendant]'s obligation with respect to each child shall end when the child attains age eighteen . . . or if a child is still attending high school when he or she attains age eighteen . . . the [defendant]'s obligation pursuant to this paragraph 3.1 shall continue until a child completes his or her high school education or attains age nineteen . . . whichever event shall first occur."

Article 3.2 provides: "In addition to the foregoing payments, the [defendant] shall cause the [plaintiff] to receive from the children's trusts and/or custodial accounts established for their benefit, as set forth on Schedule A hereto, the sum of FIFTEEN THOUSAND . . . DOLLARS per year per child payable on January 1st each year, commencing January 1, 2006, as a contribution to their support. The [plaintiff] shall take all steps necessary to facilitate these payments as transfers. The [defendant]'s obligation with respect to each child shall end when the child attains age eighteen . . . or if a child is still attending high school when he or she attains age eighteen . . . the [defendant]'s obligation pursuant to this paragraph 3.2 shall continue until a child completes his or her high school education or attains age nineteen . . . whichever event shall first occur." Schedule A is titled "Assets Held by the Parties for the Benefit of the Minor Children." It contains the identifying information for seven custodial and trust accounts and specifies the amounts held in each of the accounts.

The third paragraph of the separation agreement at issue is located in article V, entitled "Education." Specifically, article 5.1 provides: "The [plaintiff] shall pay the first EIGHTY THOUSAND . . . DOLLARS per year of the children's grammar, middle and high school tuition, tutoring, and fees while all four children are in grammar, middle and high school ('school'). If the tuition, tutoring and fees exceed EIGHTY THOUSAND . . . DOLLARS when four children are in school, SIXTY THOUSAND

. . . DOLLARS when three children are in school, FORTY THOUSAND . . . DOLLARS when two children are in school or TWENTY THOUSAND . . . DOLLARS when one child is in school the difference shall be paid one-half . . . by the [defendant] and one-half . . . by the custodial account or trust account for the relevant child."

On December 23, 2009, the plaintiff filed a motion to modify the defendant's child support obligations and a motion for order with respect to the defendant's alimony obligations. Only two of the parties' four children, Timothy[1] and John, were minors when the plaintiff commenced the present proceedings.

The alleged ground for the plaintiff's motion to modify child support was that there had been a substantial change in circumstances because of (1) a decrease in her income, (2) a decrease in the defendant's alimony payments to her, and (3) an increase in the defendant's assets. The relief requested by the plaintiff in the motion to modify child support included attorney's fees and an increase in the amount of the defendant's child support payments. The alleged ground for the motion for order with respect to alimony was that the defendant had violated article 2.4 of the separation agreement, which provided that "[t]he [defendant] shall take no action which has as its purpose the defeating of the [plaintiff]'s right to receive alimony," because he had manipulated his income so that it became significantly lower than it had been in the past. The relief requested by the plaintiff in the motion for order with respect to alimony included attorney's fees and factual findings that would result in an arrearage and a higher income base for calculating alimony payments.

The court, *Hon. Kevin Tierney*, judge trial referee, heard both motions on September 9, September 10, October 28, and October 29, 2010. The plaintiff filed her proposed orders on September 9, 2010. In addition to restating her previous requests for relief with greater specificity, the plaintiff also proposed that the court order, inter alia, that "[t]he defendant shall not pay any of his child support obligations from the trusts established for the children's benefit." The plaintiff subsequently filed amended proposed orders on October 28, 2010. She amended the September 9, 2010 proposed orders to state that "[t]he defendant shall not pay any of his child support obligations from the accounts and/ or trusts established for the children's benefit."[2] She also requested an increase in the defendant's child support obligation to $6963.33 per month per minor child.

On March 29, 2011, the court issued two memoranda of decision: one denying the motion for order with respect to alimony and the other granting the motion to modify child support. The ensuing court orders at issue in the present appeal (1) terminated the previously operative orders established by articles 3.1, 3.2, and 5.1

of the separation agreement; (2) set the defendant's child support obligation at $6963 per month per minor child, to be paid for each child until each child reached the age of majority; (3) set the parties' obligations for the minor children's educational expenses at 83 percent for the defendant and 17 percent for the plaintiff, to be paid for each child until each child reached the age of majority; and (4) required the defendant to pay $55,000 to the plaintiff as attorney's fees for her prosecution of the motion to modify child support.

The present appeal followed. The plaintiff has not appealed from the court's denial of her motion for order with respect to alimony. Therefore, only the court's judgment rendered on the plaintiff's motion to modify child support is presently before us. Additional facts and procedural history will be set forth as necessary.

I

LEGAL STANDARDS

A

Standard of Review for Modifications
of Child Support Obligations

"The scope of our review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the [trial] court correctly applied the law and could reasonably have concluded as it did. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Nevertheless, we may reverse a trial court's ruling on a modification motion if the trial court applied the wrong standard of law. . . .[3]

"[General Statutes §] 46b-86[4] governs the modification or termination of an alimony or support order after the date of a dissolution judgment. When, as in this case, the disputed issue is alimony [or child support], the applicable provision of the statute is § 46b-86 (a), which provides that a final order for alimony [or child support] may be modified by the trial court upon a showing of a substantial change in the circumstances of either party. . . . Under that statutory provision, the party seeking the modification bears the burden of demonstrating that such a change has occurred. . . . To obtain a modification, the moving party must demonstrate that circumstances have changed since the last court order such that it would be unjust or inequitable to hold either party to it. Because the establishment of changed circumstances is a condition precedent to a party's relief, it is pertinent for the trial court to inquire as to what, if any, new circumstance warrants a modification of the existing order. . . .

"Once a trial court determines that there has been a substantial change in the financial circumstances of

one of the parties, the same criteria that determine an initial award of alimony and support are relevant to the question of modification. . . . More specifically, these criteria, as outlined in General Statutes § [46b-84],[5] require the court to consider the needs and financial resources of each of the parties and their children . . . . The power of the trial court to modify the existing order does not, however, include the power to retry issues already decided . . . or to allow the parties to use a motion to modify as an appeal. . . . Rather, the trial court's discretion includes only the power to adapt the order to some distinct and definite change in the circumstances or conditions of the parties. . . .

"Thus, [w]hen presented with a motion for modification, a court must first determine whether there has been a substantial change in the financial circumstances of one or both of the parties. . . . Second, if the court finds a substantial change in circumstances, it may properly consider the motion and, on the basis of the § [46b-84] criteria, make an order for modification. . . . The court has the authority to issue a modification only if it conforms the order to the distinct and definite changes in the circumstances of the parties." (Citations omitted; footnotes altered; internal quotation marks omitted.) *Olson* v. *Mohammadu*, 310 Conn. 665, 671–74, 81 A.3d 215 (2013).

The court found "that the [plaintiff] ha[d] established a substantial change in the circumstances of both parties since the last order of child support on November 30, 2005. In 2007, the [defendant] was paid an incentive bonus in excess of $40,000,000. That bonus increased his assets and the potential for increased investment income on those assets. The [plaintiff]'s alimony paid pursuant to article 2.2 of the separation agreement based upon the [defendant]'s 'annual gross compensation from employment' and its formula has decreased. The [plaintiff]'s assets have decreased since November 30, 2005. Her November 30, 2005 financial affidavit . . . indicated assets of $23,438,810.18, and her current financial affidavit dated September 8, 2010 . . . indicated assets of $15,407,123.42. This decrease in the [plaintiff]'s assets of over $8 [million] is more than a [25] . . . percent reduction in her assets since the last child support order on November 30, 2005." (Citations omitted.) Neither party has appealed from nor challenged on appeal the court's conclusions regarding the substantial changes in the parties' financial circumstances. Therefore, only the modification portion of the court's judgment presently is before us.[6]

B

Legal Standards for Modifications of Child Support
Obligations in High Asset, High Income
Familial Situations

Our Supreme Court in *Dowling* v. *Szymczak*, 309

Conn. 390, 400–402, 72 A.3d 1 (2013), provides clear, definitive, and recent guidance for determining child support obligations in high asset, high income familial situations: "In a trilogy of recent cases, this court has already discussed the guidelines and accompanying schedule in detail. See *Maturo* v. *Maturo*, supra, 296 Conn. 80; *Misthopoulos* v. *Misthopoulos*, [297 Conn. 358, 999 A.2d 721 (2010)]; *Tuckman* v. *Tuckman*, 308 Conn. 194, 61 A.3d 449 (2013). Accordingly, we will not till this legal landscape any more than is necessary for the resolution of the present case. . . . [T]he schedule [in the guidelines] sets forth a presumptive percentage and resultant amount corresponding to specific levels of combined net weekly income; the schedule begins at $50 and continues in progressively higher $10 increments, terminating at $4000. . . . This court has recognized that the guidelines nonetheless apply to combined net weekly income in excess of that maximum amount. . . . Indeed, the regulations direct that, [w]hen the parents' combined net weekly income exceeds $4,000, child support awards shall be determined on a case-by-case basis, and the current support prescribed at the $4,000 net weekly income shall be the minimum presumptive amount. . . .

"While the regulations clearly demarcate the presumptive minimum amount of the award in high income cases, they do not address the maximum permissible amount that may be assigned under a proper exercise of the court's discretion. . . . [T]his court has remained mindful that the guidelines . . . indicate that such awards should follow the principle expressly acknowledged in the preamble [to the guidelines] and reflected in the schedule that the child support obligation as a percentage of the combined net weekly income should decline as the income level rises. . . . We therefore have determined that child support payments . . . should presumptively not exceed the [maximum] percent [set forth in the schedule] when the combined net weekly income of the family exceeds $4000, and, in most cases, should reflect less than that amount. . . .

"Either the presumptive ceiling of income percentage or presumptive floor of dollar amount on any given child support obligation, however, may be rebutted by application of the deviation criteria enumerated in the guidelines and by the statutory factors set forth in § 46b-84 (d). . . . In order to justify deviation from this range, the court must first make a finding on the record as to why the guidelines were inequitable or inappropriate . . . . Thus, this court unambiguously has stated that, when a family's combined net weekly income exceeds $4000, the court should treat the percentage set forth in the schedule at the highest income level as the presumptive ceiling on the child support obligation, subject to rebuttal by application of the deviation criteria enumerated in the guidelines, as well as the statutory factors described in § 46b-84 (d). . . . In other words,

as long as the child support award is derived from a total support obligation within this range—between the presumptive minimum dollar amount and the presumptive maximum percentage of net income—a finding in support of a deviation is not necessary." (Citations omitted; emphasis omitted; internal quotation marks omitted.)

## II

### TRIAL COURT'S MEMORANDUM OF DECISION

We now address the court's memorandum of decision as to its calculation of the defendant's modified child support obligation. We do so to reflect that we review the defendant's claims in the order set forth by the defendant. We address separately, however, in our analysis of the defendant's second claim in part III B of this opinion, the part of the court's decision regarding the award of attorney's fees to the plaintiff. We do so because this part of the court's decision does not involve the court's calculation of the defendant's modified child support obligation.

### A

#### As to Defendant's First and Third Claims, Regarding Court's Consideration of His Earning Capacity

The court calculated the defendant's modified child support obligation in the following fashion. It first considered the plaintiff's income, which consisted solely of her investment income from dividends, taxable interest, and tax free interest and totaled $5390 per week in gross income and $4823 per week in net income. The court then considered the parties' dispute regarding the amount of the defendant's income for the purpose of calculating his modified child support obligation. The defendant sought to have the court attribute $12,307 per week in gross income to him, a number that he derived from the $400,000 in annual employment income and $240,000 in annual investment income that he listed on his guidelines worksheet. The plaintiff, on the other hand, sought to have the court attribute $32,636 per week in gross income to the defendant, a number that she derived from the defendant's past employment income and his earning capacity with respect to his investment income. In support of her position, the plaintiff offered proof that the average of the defendant's annual employment income for the years 2005, 2006, and 2007 was $1,327,771.

The defendant argued that the court should not consider his earning capacity with respect to his employment income because of (1) his continued employment as a high level executive in the reinsurance brokerage industry at all relevant times and (2) the plaintiff's improper intent to obtain additional alimony in the guise of child support. The court noted that "the defendant, by agreeing to the separation agreement and being ordered to pay child support and other child related

expenses, assumed an obligation to place the financial interests of his children ahead of his personal financial interests." It also noted that the parties' children had not been represented by counsel during the dissolution proceedings. The court then turned its attention to the defendant's financial affidavit and observed: "[The defendant's] net monthly income . . . is $31,322.95 . . . . His monthly expenses are $67,606.12 of which $10,042 is alimony and $2500 is child support. His monthly personal expenses are $55,064.12. . . . The court concludes that the [defendant] pays these monthly personal expenses from his assets. The [defendant]'s standard of living . . . far exceeds his net monthly income." (Citation omitted.)

The court subsequently examined the history of the defendant's employment income: "As of November 30, 2005, the [defendant]'s W-2 wages and bonus income was $984,240. For 2006, his W-2 earnings were $736,165. For 2007, his W-2 earnings were $2,262,908. . . . In 2007 . . . he received an incentive bonus of $40,382,386 [for the sale of a reinsurance business in which he made significant contributions]. . . . This gave the [defendant] the freedom to start a new business venture in which his financial goals focused on capital gains and increased earnings at some time in the future, as opposed to current salary income. Thus, in 2008 his W-2 salary was reduced to $182,961. . . . In 2009, his W-2 salary was $216,904. . . . He was originally paid in his current employment $200,000 per year salary, and that has been increased to $400,000 per year." (Citations omitted.)

The court concluded that "[i]t [was] reasonable . . . to use the years 2005, 2006 and 2007 to establish earning capacity since those were the years immediately following the dissolution prior to the 2007 sale of the business. The average of those three gross incomes for 2005, 2006 and 2007 is $1,327,771," and the court used this average as the defendant's earning capacity from employment income in calculating its modified child support orders.

The court then addressed the parties' dispute regarding the defendant's investment income. The defendant claimed annual investment income of $240,000, or a 0.007860970 percent rate of return, on investment assets of $30,530,634. The plaintiff argued that the rate of return on the defendant's investment assets was too low and that the court should impute a 2.72 percent rate of return on them. The plaintiff's proposed rate of return was the "Treasury nominal constant maturities-Nominal 10 Year" rate listed at the time in "Federal Reserve Statistical Release H-15," a regularly updated compilation published by the Federal Reserve of historical rates of return for a variety of investment instruments. The court determined that "taking judicial notice of a Treasury instrument without more information is of little assistance to a trial court in determining an

accurate imputed rate of return on investable assets," and it turned its attention to the state of the financial markets from 2005 to 2010. The court noted that the defendant had changed his investment strategy in late 2007, to "conservative holdings with an emphasis on cash-type investments" in order to "[preserve] his capital," but it ultimately concluded that "at some point, a prudent investor should have reinvested more actively in the market since its low point in 2009."

On this basis, the court decided to disregard the defendant's actual rate of return and impute a rate of return on the defendant's investment income. It then discussed the parties' failure to offer documentary, expert, and/or testimonial evidence "for the purpose of determining a rate of return," even though it had given the parties the opportunity to do so during the hearing. It found, however, "one rate of return that was provided by the evidence"—the rate of return that was based on the plaintiff's annual investment income of $280,271 from her investment assets of $12,549,102. The court observed that the rate was absent from the plaintiff's financial affidavit and the oral argument and testimony presented during the hearing. It nonetheless determined that there was sufficient evidence to ascertain the rate, which it calculated to be 2.23339 percent. The court noted that "neither party questioned this rate during the hearing" and that "[b]oth appeared to have accepted it." It therefore imputed a 2.23339 percent rate of return on the defendant's investment assets and found that his earning capacity from his investment income was $682,024 per year.

The court then turned its attention to several different methodologies proposed by the plaintiff in order to justify her request to increase the defendant's child support obligation from the November, 2005 agreed upon amount of $1250 to $6963.33 per month per child. The first methodology used the defendant's actual employment income, imputed investment income to him on the basis of the 4.3 percent rate of return that he achieved in 2008, and yielded the requested amount. The second methodology used the defendant's actual employment income, imputed investment income to him on the basis of the 2.72 percent "Treasury constant maturities-Nominal 10 year" rate of return, and yielded an amount less than the requested amount. The plaintiff requested that the court apply the deviation criteria to this lesser amount in order to justify an upward deviation to her requested amount. Finally, the plaintiff's third proposed methodology imputed annual employment income to the defendant in the amount of $1,327,723 and then presented two alternate calculations that were based on the two aforementioned amounts of imputed investment income. The court noted that both calculations yielded amounts significantly greater than the amount requested by the plaintiff.

The court subsequently commenced its calculation of the defendant's modified child support obligation. It added the defendant's imputed employment income and investment income to arrive at a gross annual earning capacity of $2,009,745. It then subtracted the defendant's claimed annual gross income of $639,964 from his gross annual earning capacity to arrive at $1,369,781, which it labeled "additional . . . earning capacity." The court deducted federal and state taxes from the additional earning capacity to arrive at an additional net annual income of $832,485 or, stated differently, an additional net weekly income of $16,009. The court added the defendant's claimed net weekly income of $7754 and his additional net weekly income of $16,009 to arrive at a total net weekly income of $23,763.

The court added the defendant's net weekly income of $23,763 and the plaintiff's net weekly income of $4823 to arrive at a combined net weekly income of $28,586— 83.13 percent was attributable to the defendant, and 16.87 percent was attributable to the plaintiff. The court applied the percentages to $636, the presumptive weekly child support obligation on the guidelines schedule for families with combined net weekly incomes of or greater than $4000, and determined that the defendant's share of the amount would be $529. The court performed a similar calculation to the product of $28,586 and 15.89 percent, the percentage on the guidelines schedule to be applied in situations involving two children and a combined net weekly income of or greater than $4000. The product of the two numbers was $4542, and the court determined that the defendant's share would be $3776 per week for both children.

At this point, the court shifted its focus to determining the needs of the minor children. It did so in exhaustive fashion, considering the plaintiff's financial affidavit and her testimony to calculate amounts representing expenses related to, inter alia, child care, education, food, housing, medical care, recreation, travel, and the minor children's allowances and discretionary spending. The court excluded the education related expenses from its calculation of both minor children's overall needs, which it ultimately determined to be $24,297 per month. The court compared its calculation to the plaintiff's requested amount of $6963 per month per minor child and held: "This request is based on the [plaintiff's] own allocation of the costs to meet the needs of the minor children. Since this is a more accurate allocation than performed by this court, the court finds that $6963 per month per child are the needs of the minor children." The court observed that $6963 per month per minor child provided for $3214 per week for both children, which was 11.24 percent, as opposed to 15.89 percent, of the combined net weekly income of $28,586.

The court concluded: "[T]he presumptive support

award under the guidelines is $636 per week, and that sum is wholly inequitable, inadequate and inappropriate. The court has delineated the needs of the children above at $6963 per month per minor child, and those needs meet the following deviation criteria: (1) Special circumstances: 'Best interests of the child' . . . (2) Special circumstances: 'Other equitable factors' . . . and (3) 'Extraordinary expenses for care and maintenance of the child' . . . ." (Citations omitted.)

The court clarified its holding in a January 18, 2012 articulation that it filed in response to an October 13, 2011 motion for articulation that the plaintiff filed with this court. The court stated that it had "made only one finding as to the needs of the two minor children, $24,297 per month." It then elaborated: "The court acceded to the plaintiff's $6963 monthly . . . child support request, and it deferred to her request. In doing, so the court may have mistakenly used the word 'finds' . . . . Thus, the sentence shall read: 'Since this is a more accurate allocation than performed by this court, the court finds that the $6963 per month per child are the needs of the minor children based on the [plaintiff]'s own allocation.' "

B

As to Defendant's Fourth Claim, Regarding
Court's Treatment of Minor Children's
Custodial and Trust Accounts

In the middle of its memorandum of decision, the court shifted from the question of how it should calculate the defendant's modified child support obligation to the question of "[h]ow . . . the court [should] treat the minor children's estate and income in determining whether or not to modify child support . . . ." The court noted: "This is not an academic question . . . . According to the [defendant]'s financial affidavit, the total assets in the children's custodial accounts and children's trusts were just under $6,000,000, even after the payment of college education costs and $15,000 per child per year child support from these funds." The court then repeated that the guidelines are a mandatory basis for all child support orders, per *Maturo*, and observed that the guidelines do not include a child's estate and/or income among the recognized factors in a court's calculation of a presumptive child support amount, even though § 46b-84 (d) lists it as a factor that "the court shall consider" when "determining whether a child is in need of maintenance, and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof . . . ." Instead, the court determined that a child's estate and/or income may be a deviation criterion under § 46b-215a-3 (b) (6) (D) of the Regulations of Connecticut State Agencies[7] for a court to consider in awarding child support in an amount different from the presumptive amount.

The court also enumerated twenty factors involving the lack of relevant authority regarding the relationship between a child support order and a child's estate and/or income; the lack of evidence before it regarding the specifics of the children's custodial and trust accounts; and the children's lack of representation during the dissolution proceedings. It considered these factors along with its interpretation of the relevant regulations and statutes, and it concluded that it could not "consider the 'amount and sources of income' of the minor child and/or 'the estate . . . of the child' under [§] 46b-84 (d) without (1) complying with the deviation criteria procedures, (2) the court having detailed information on the child's income and assets, and (3) the minor child or children being represented by an attorney and/or . . . guardian ad litem." The court accordingly ruled: "For the reasons stated, the court is only going to consider the income and imputed income of both parents and not consider either the 'amount and sources of income' or 'estate' of either of the two minor children, either as a statutory factor, a guideline consideration, or a deviation criterion."

## III

### DEFENDANT'S CLAIMS

#### A

#### Defendant's First Claim: Whether Court Erred in Using Defendant's Earning Capacity in Calculating His Modified Child Support Obligation

The defendant claims that the court erred in determining the defendant's modified child support obligation because it based its calculations on the defendant's imputed income and not on his actual income and the minor children's demonstrated needs,[8] in violation of *Maturo* and the guidelines. We agree. The court's error in its approach to the defendant's imputed income is not merely a matter of form. We do not reverse the judgment with respect to the court's calculation of the defendant's modified child support obligation simply because the court failed to cite the presumptive support amount calculated with the defendant's actual income before it decided to deviate from the guidelines' requirements and determine the defendant's modified child support obligation on the basis of his imputed income. Instead, we reverse the judgment with respect to the court's calculation of the defendant's modified child support obligation because the court's error in its approach to the defendant's imputed income is also a matter of substance. A party's earning capacity is a deviation criterion under the guidelines, and, therefore, a court must specifically invoke the criterion and specifically explain its justification for calculating a party's child support obligation by virtue of the criterion instead of by virtue of the procedures outlined in the

guidelines. The court in the present case did not invoke the defendant's earning capacity as a deviation criterion in calculating the defendant's modified child support obligation, and it did not explain why an obligation calculated in accordance with the defendant's actual income, pursuant to the guidelines, would be inequitable or inappropriate, thus warranting an obligation calculated in accordance with the defendant's earning capacity instead.

"It is well established that the trial court may under appropriate circumstances in a marital dissolution proceeding base financial awards . . . on the earning capacity of the parties rather than on actual earned income. . . . Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Tanzman* v. *Meurer*, 309 Conn. 105, 113–14, 70 A.3d 13 (2013). "[W]hen a trial court has based a financial award . . . on a party's earning capacity, the court must determine the specific dollar amount of the party's earning capacity." Id., 117. "[A] court properly may impute earning capacity from employment . . . [and] [w]e can perceive no reason to adopt a different standard for the ascertainment of investment income than the one we employ for the ascertainment of earning capacity." (Citation omitted.) *Weinstein* v. *Weinstein*, 280 Conn. 764, 772, 911 A.2d 1077 (2007).

Factors that a court may consider in calculating a party's earning capacity include "evidence of that party's previous earnings"; *Boyne* v. *Boyne*, 112 Conn. App. 279, 283, 962 A.2d 818 (2009); "[l]ifestyle and personal expenses . . . where conventional methods for determining income are inadequate"; (internal quotation marks omitted) *Milazzo-Panico* v. *Panico*, 103 Conn. App. 464, 468, 929 A.2d 351 (2007); and "whether the defendant has wilfully restricted his earning capacity to avoid support obligations," although "we never have required a finding of bad faith before imputing income based on earning capacity." (Internal quotation marks omitted.) *Weinstein* v. *Weinstein*, supra, 280 Conn. 772.

"Under the guidelines, the child support obligation first is determined without reference to earning capacity, and earning capacity becomes relevant only if a deviation from the guidelines is sought under § 46b-215a-3 (b) (1) (B) [of the Regulations of Connecticut State Agencies]. Pursuant to § 46b-215a-3 (a), the amount of support determined without reference to the deviation criteria is presumed to be the correct amount of support, and that presumption may only be rebutted by a specific finding on the record that the application

of the guidelines would be inequitable or inappropriate under the circumstances of a particular case. When the latter is true, § 46b-215a-3 (b) (1) (B) allows deviation from the guidelines on the basis of a parent's earning capacity." *Unkelbach* v. *McNary*, 244 Conn. 350, 371, 710 A.2d 717 (1998); see also *Reizfeld* v. *Reizfeld*, 125 Conn. App. 782, 794–95, 40 A.3d 320 ("the defendant's argument that the court improperly deviated from the child support guidelines by using the plaintiff's actual gross income is misguided, as the deviation would instead be in using the plaintiff's earning capacity"), cert. denied, 300 Conn. 915, 13 A.3d 1103 (2011); A. Rutkin et al., 8 Connecticut Practice Series: Family Law and Practice (3d Ed. 2010) § 38:21, pp. 318–19.

Our examination of the guidelines confirms that earning capacity is a deviation criterion for a court to consider after it has made its initial calculation of a child support obligation with a party's actual net income. There is no express or implied reference to earning capacity in § 46b-215a-2b of the Regulations of Connecticut State Agencies, which "shall be used to determine the current support . . . components of all child support awards within the state, subject to [§] 46b-215a-3 of the Regulations of Connecticut State Agencies." Regs., Conn. State Agencies § 46b-215a-2b (a) (1). To the extent that the regulation refers to any type of earned income, it does so in the context of "gross income" and "net income." Section 46b-215a-1 (11) and (17) of the Regulations of Connecticut State Agencies, respectively, define "gross income" in relevant part as "the average weekly earned and unearned income from all sources before deductions . . . ." and "net income" as "gross income minus allowable deductions." Section 46b-215a-1 (11) (A) does not list earning capacity among the "gross income inclusions" that a court or party may make.

Section 46b-215a-3 (a) of the Regulations of Connecticut State Agencies provides in relevant part that "[t]he current support . . . amounts calculated under [§] 46b-215a-2b of the Regulations of Connecticut State Agencies . . . are presumed to be the correct amounts to be ordered. The presumption regarding each such amount may be rebutted by a specific finding on the record that such amount would be inequitable or inappropriate in a particular case. . . . Any such finding shall state the amount that would have been required under [the section] and include a factual finding to justify the variance. Only the deviation criteria stated in the lettered subparagraphs of subdivisions (1) to (6), inclusive, of subsection (b) of this section, and indicated by the check boxes in section VII of the worksheet, shall establish sufficient bases for such findings." Section 46b-215a-3 (b) (1) (B) of the Regulations of Connecticut State Agencies expressly lists "the parent's earning capacity" among the "[c]riteria for deviation from presumptive support amounts"; Regs., Conn. State

Agencies § 46b-215a-3 (b); as a financial resource that is "not included in the definition of net income, but could be used by such parent for the benefit of the child or for meeting the needs of the parent. . . ." Id., § 46b-215a-3 (b) (1).

We also observe that there is no section on the worksheet for a party to list earning capacity. See Regs., Conn. State Agencies § 46b-215a-5b. A party may indicate his or her intent to rely on earning capacity, however, by checking a box labeled "parent's earning capacity" in § VII of the worksheet, entitled "Deviation Criteria." Regs., Conn. State Agencies § 46b-215a-5b. This section contains a checklist of the deviation criteria contained in § 46b-215a-3 (b) of the Regulations of Connecticut State Agencies, and it instructs a party to "[c]heck all boxes that apply." (Emphasis omitted.) Regs., Conn. State Agencies § 46b-215a-5b. Section 46b-215a-2b (c) (7) (A) of the Regulations of Connecticut State Agencies provides: "If a deviation criterion applies, complete section VII of the worksheet, checking all the boxes that apply, and attach an additional sheet if necessary to explain the deviation. . . ."

At no point in its comprehensive memorandum of decision did the court in the present case calculate the defendant's presumptive child support obligation on the basis of his actual employment income and investment income. The court noted the defendant's actual income but focused its analysis on its calculations and reasons for imputing additional income. The combined net weekly income found by the court reflects the court's decision to disregard the defendant's actual income. In determining the defendant's net weekly income as a component of the parties' combined net weekly income, the court based its calculations on only the defendant's imputed income. The plaintiff undertook a similar approach in presenting to the court her various methodologies for arriving at a modified child support obligation of $6963 per month per minor child. She imputed investment income to the defendant in all three methodologies instead of using his actual investment income and its 0.007860970 rate of return. The court "acceded . . . and . . . deferred to [the plaintiff's] request[ed]" amount and, therefore, her methodologies in coming to its conclusion, even though it had performed its own calculations.

The absence of the defendant's actual income from the court's calculation of the presumptive support amount is not simply an omission of an amount on the defendant's worksheet that the court chose to disregard. It also is contrary to the requirement that "a trial court must make an on-the-record finding of the presumptive support amount" under the guidelines, which do not provide for the incorporation of a party's earning capacity into the calculation of his or her presumptive support amount. (Internal quotation marks omitted.)

*Kavanah* v. *Kavanah*, 142 Conn. App. 775, 780, 66 A.3d 922 (2013). The court's erroneous calculation of the presumptive support amount affected the rest of its calculations regarding the defendant's modified child support obligation. For example, the court stated toward the end of its memorandum of decision that its order modifying the defendant's child support obligation complied with the guidelines because the amount of $6963 per month per child equaled 11.24 percent of the parties' combined net weekly income, less than the 15.89 percent listed in the guidelines for families with two children and combined net weekly incomes of or greater than $4000. The court could not have complied with the guidelines here, however. In these division calculations—where the child support amount was the divisor, the parties' net income was the dividend, and the resulting percentage was the quotient—the dividend, i.e., the parties' combined net weekly income, improperly incorporated the defendant's imputed income, in contravention of the guidelines. The court's erroneous reliance on the income it imputed to the defendant in establishing the parties' combined net weekly income thus tainted the entirety of its modified child support calculations. For this reason, our Supreme Court's determination in *Dowling* that "a finding in support of a deviation is not necessary" when "the child support award is derived from a total support obligation within [the] range . . . between the presumptive minimum dollar amount and the presumptive maximum percentage of net income" does not apply to the facts of this case. *Dowling* v. *Szymczak*, supra, 309 Conn. 402.

Furthermore, the court did not list the defendant's earning capacity among the deviation criteria on which it relied in holding that the defendant's modified child support obligation should be $6963 per month per minor child. The court also did not state (1) the presumptive support amount at which it arrived by applying the guidelines and using the defendant's actual income or (2) a factual finding on which it relied in deviating from the presumptive support amount. Likewise, the box labeled "parent's earning capacity" in the "Deviation Criteria" section of the worksheet is unchecked on both copies of the worksheet submitted by the parties during the hearing. The court made no reference to this oversight in considering the defendant's earning capacity as an element of the defendant's gross income and not as a deviation criterion. Because the court did not treat the defendant's earning capacity as a deviation criterion, it did not subject the plaintiff's position that the court should base the defendant's modified child support obligation on his earning capacity instead of his actual income to the rigorous requirement of a "specific finding on the record that the presumptive support amount would be inequitable or inappropriate." (Internal quotation marks omitted.) *Kavanah* v. *Kavanah*, supra, 142 Conn. App. 780. Such a finding "must include

a statement of the presumptive support amount and [an explanation of] how application of the deviation criteri[on] justifies the variance." (Internal quotation marks omitted.) Id. Even though the court spoke generally of certain factors on which it relied in deciding to impute employment and investment income to the defendant; see part II B of this opinion; it did not articulate why the defendant's imputed income would be a more appropriate or equitable basis for calculating the defendant's modified child support obligation than the defendant's actual income or the presumptive support amount range; see *Dowling* v. *Szymczak*, supra, 309 Conn. 402; calculated in accordance with the defendant's actual income. The court's rationale for using the defendant's imputed income instead of his actual income in its calculations also lacks any reference to the demonstrated needs of the minor children, which further undermines any justification for the variance. Affirming the judgment with respect to the child support orders would amount to sanctioning the court's bypassing of and noncompliance with the guidelines' clear and firm requirements regarding the use of deviation criteria and presumptive support amounts. We decline to do so, especially in light of the growing line of cases in which our Supreme Court has stated unequivocally that the guidelines and their underlying principles limit the discretion accorded to trial courts tasked with fashioning child support awards in high income, high asset familial situations. See id., 400 (citing and discussing cases). Although a trial court's discretion in a domestic relations matter may be broad, it is not so expansive that it encompasses clear omissions of required procedures for setting child support obligations in high income, high asset familial situations, especially in light of *Maturo* and its progeny. The court misapplied the guidelines, and we accordingly reverse its judgment as to all of its modified child support orders.

We do so because "[w]e previously have characterized the financial orders in dissolution proceedings as resembling a mosaic, in which all the various financial components are carefully interwoven with one another. . . . Accordingly, when an appellate court reverses a trial court judgment based on an improper alimony, property distribution, or child support award, the appellate court's remand typically authorizes the trial court to reconsider all of the financial orders. . . . We also have stated, however, that [e]very improper order . . . does not necessarily merit a reconsideration of all of the trial court's financial orders. A financial order is severable when it is not in any way interdependent with other orders and is not improperly based on a factor that is linked to other factors. . . . In other words, an order is severable if its impropriety does not place the correctness of the other orders in question." (Citations omitted; internal quotation marks omitted.) *Maturo* v.

*Maturo*, supra, 296 Conn. 124–25.

Our Supreme Court concluded in *Maturo* that its reversal of certain child support orders necessarily affected the trial court's other child support orders because the former series of orders involved allocations and calculations that influenced the latter series of orders. Id. Similarly, we conclude in the present case that we must reverse the judgment as to all of the modified child support orders because the court erred in determining both the defendant's income and the presumptive support amount under the guidelines, and these numbers are central to all allocations and calculations underlying all of the modified child support orders.

B

Defendant's Second Claim: Whether Court Erred
in Awarding Attorney's Fees to Plaintiff

We still must address, however, the defendant's claim that the court erred in awarding attorney's fees to the plaintiff for her prosecution of her motion to modify child support because she has substantial liquid assets, and the award was not necessary in order to avoid undermining the court's other related financial orders. As the court observed, General Statutes § 46b-62, which governs attorney's fees awards for motions to modify brought under § 46b-86, "does not require the movant to be successful on the prosecution of the underlying motion," in contrast to General Statutes § 46b-87, which governs attorney's fees awards for motions for contempt brought in domestic relations matters.[9] Cf. *Misthopoulos* v. *Misthopoulos*, supra, 297 Conn. 383–90 (affirming alimony and attorney's fees awards in dissolution action but reversing all child support orders); *Berry* v. *Berry*, 88 Conn. App. 674, 686–87, 870 A.2d 1161 (2005) (addressing and affirming trial court's denial of plaintiff's motion for attorney's fees after addressing and affirming trial court's denial of plaintiff's motion for upward modification of alimony).[10] The order awarding attorney's fees to the plaintiff therefore is severable from the orders modifying the defendant's child support obligations. We accordingly consider the defendant's claim and conclude that we agree with it.

"We review a decision granting or denying attorney's fees for an abuse of discretion. . . . An abuse of discretion . . . will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did. . . . General Statutes § 46b-62[11] governs the award of attorney's fees in child support proceedings and provides that the court may order . . . either parent to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. These criteria include, inter alia, the parties' occupations, earnings, vocational skills and employability.

General Statutes § 46b-82 (a).[12] A court will award attorney's fees in order to prevent a party from being deprived of his or her rights due to financial paucity. . . . If both parties are able to afford their own attorney's fees, however, a court generally will not award them unless failure to make an award would undermine [the court's] prior financial orders . . . ." (Citations omitted; footnotes added; internal quotation marks omitted.) *Dowling* v. *Szymczak*, supra, 309 Conn. 410.

The plaintiff requested attorney's fees for her motion for order regarding alimony and her motion to modify child support. The court found that the total amount of the attorney's fees claimed for both motions was $111,970.55 and that the plaintiff's attorneys divided the work represented by the amount almost equally between the two motions. The court then determined with respect to the claim for attorney's fees and the motion to modify child support that "ordering the [plaintiff] to pay attorney fees for an increased child support undermines the child support orders" because "requir[-ing] the [plaintiff] to pay a portion of the attorney fees . . . out of the increased child support would be to deprive the children of their just financial support." The court elaborated: "In effect, ordering [the plaintiff] to pay attorney fees to collect increased child support requires the child to pay for these attorney fees in the form of reduced child support."

The court accordingly ordered: "The [plaintiff] should pay for that portion of the incurred attorney fees related to her prosecution of the alimony motion since these increased alimony funds would have become her property, and she has ample liquid assets with which to pay those attorney's fees. The [defendant] should pay that portion of the . . . attorney fees and disbursements that relate to the prosecution of the child support proceedings." The court found the portion of the attorney's fees that related to the child support proceedings to be $55,000.

In *Bornemann* v. *Bornemann*, 245 Conn. 508, 544–45, 752 A.2d 978 (1998), our Supreme Court affirmed an award of attorney's fees to the plaintiff wife in a dissolution action: "[H]ere the record would support a finding by the trial court either that the plaintiff lacked sufficient liquid assets with which to pay her own attorney's fees, or that the failure to award attorney's fees would have undermined its other financial orders. In addition to owing $27,000 to her own attorneys, the plaintiff was ordered to pay one half of the attorney's fees for the parties' minor child, and one half of the fees for two expert witnesses. Of the significant assets that the plaintiff received in the distribution, only the shares of stock would have been easily convertible to liquid form; the family residence and automobile were not liquid assets, the first three flights of stock options had not yet been exercised, and the fourth flight was not yet exercisable

as of the date of dissolution. Further, the shares of stock owned outright that were awarded to the plaintiff were not worth an amount sufficient to cover all of the fees owed. As a result, the court reasonably could have concluded that unless it awarded attorney's fees to the plaintiff, its other financial orders would be undermined, or that the plaintiff lacked the liquidity necessary to enable her to pay her own fees.''

The court distinguished its holding in *Bornemann* from its holding in *Maguire* v. *Maguire*, 222 Conn. 32, 608 A.2d 79 (1992), where it reversed the trial court's award of attorney's fees ''because both parties possessed substantial liquid assets and were financially able to pay their own attorney's fees and the court had not made a finding that the award was necessary in order to avoid undermining its other financial awards. . . . An award of $50,000 in attorney's fees had been issued to the plaintiff wife, who possessed more than $500,000 in liquid assets even before the financial award associated with the dissolution was made, and the financial orders divided the marital estate, which was valued in excess of $7,000,000, equally between the parties. In overturning the award, this court stated that 'there is nothing in the record that would support . . . a finding' that the failure to award attorney's fees would undermine the court's other financial orders.'' (Citation omitted.) *Bornemann* v. *Bornemann*, supra, 245 Conn. 544; see also *Dowling* v. *Szymczak*, supra, 309 Conn. 411–12 (affirming denial of plaintiff mother's request for attorney's fees in child support action where trial court found that plaintiff had high earning capacity and had received monetarily significant gifts from her parents).

There similarly is nothing in the record before us to support a finding that the failure to award attorney's fees would undermine the court's child support orders. In exercising its discretion to award attorney's fees to the plaintiff, the court focused on how the parties' minor children are the intended beneficiaries of the child support orders and posited that the plaintiff therefore acted on their behalf by seeking to modify the orders. The court then concluded that requiring the plaintiff to pay the attorney's fees related to her motion to modify would be akin to requiring the parties' minor children to pay them because they consequently would not receive the full modified amount of child support ordered by the court. The court made no factual findings, however, to establish any link between the attorney's fees related to the motion to modify child support and the amount of child support available for the benefit of the parties' minor children.

In contrast, the court made many factual findings about the plaintiff's substantial liquid assets and, accordingly, her ability to pay her own attorney's fees. We already have noted the court's findings that the plaintiff's September 8, 2010 financial affidavit indi-

cated assets in the amount of $15,407,123.42[13] and gross monthly investment income from dividends, taxable interest, and tax free interest in the amount of $23,356. Even though the court addressed the plaintiff's "ample liquid assets" in denying her request for attorney's fees with respect to her motion for order with respect to alimony, it appears to have ignored them in granting her request for attorney's fees with respect to her motion to modify child support.

We again acknowledge that although a trial court generally has broad discretion to award attorney's fees in domestic relations matters, such discretion has limits. The court could not have reasonably concluded as it did, given the plaintiff's undisputed substantial liquid assets compared to the amount of the fees, and the lack of any factual findings that the failure to award attorney's fees would undermine the court's other financial orders. We thus reverse the judgment as to the award of attorney's fees.

C

Defendant's Third Claim: Whether Court Erred
in Imputing a Rate of Return on Defendant's
Investment Income

The defendant's claim regarding the court's imputation of investment income to him for the purpose of calculating his modified child support obligation consists of two parts. First, the court erred because it imputed an "ordinary" rate of return on the defendant's investment income instead of using his actual rate of return, which he proved to be reasonable under the circumstances. Second, even if the court did not err in applying an imputed rate of return on the defendant's investment income, it erred in selecting an imputed rate of return that lacked evidentiary support. We agree with the second part of the defendant's claim and therefore need not address the first part.

Our resolution of this claim is governed by *Weinstein* v. *Weinstein*, supra, 280 Conn. 775–76. In *Weinstein*, our Supreme Court first held that the trial court did not err in imputing an ordinary rate of return on the defendant's investment income, which had a 1.24 percent actual rate of return, because the defendant had not met his burden of "show[ing] that the low rate of return on his investments [was] reasonable . . . ." Id., 773. The court in *Weinstein* then turned its attention to the question of whether the trial court had imputed a proper ordinary rate of return.

It determined: "At the April 21, 2003 hearing, the plaintiff put forth evidence establishing the 2.96 percent return on five year treasury bills as of that date. The defendant did not present evidence of an alternative ordinary rate of return or of an alternative type of secure investment. Nor did the defendant dispute that the 2.96 percent return on five year treasury bills was the prevail-

ing rate of return for a secure investment. Although the defendant claims on appeal that the trial court improperly imputed an ordinary rate of return on his investments, he makes no claim that, if we affirm that ruling, we should apply a different prevailing rate. Accordingly, we conclude that the trial court did not abuse its discretion in imputing income in the amount of the . . . difference between the income calculated using an ordinary rate of return, the 2.96 percent return on five year treasury bills in this case, and the defendant's actual income." (Footnotes omitted.) Id., 775–76. The court in *Weinstein* further remarked in a footnote: "We express no opinion as to whether the return on five year treasury bills is the proper rate to use as the ordinary rate of return in all future cases. We conclude only that the trial court's use of that rate of return was not in dispute in this case." Id., 776 n.11.

Neither party in the present case disputed the court's ability to take judicial notice of the various historical rates of return listed on the then operative version of "Federal Reserve Statistical Release H-15." See part II A of this opinion. Instead of imputing one of these rates of return to the defendant's investment income,[14] however, the court selected a rate of return (2.23 percent) that was the quotient of the plaintiff's annual investment income ($280,271) divided by the value of her investable assets ($12,549,102). The basis for the court's selection was that "[n]either party offered expert evidence on the rates of return of [the defendant's] investable assets," even though "it was incumbent upon [them] to offer [such] testimony," and the 2.23 percent rate of return was "one rate of return that was provided by the evidence . . . ." The court acknowledged: "Although the rate of return was not calculated on [the plaintiff's] September 8, 2010 financial affidavit and was not mentioned in testimony or in oral argument, such evidence was before the court." The court's position that the evidence provided for the 2.23 percent rate of return is belied by the fact that it obtained this rate of return by performing its own mathematical calculations as opposed to citing to any particular piece of evidence that contained such calculations.

Furthermore, the record is silent with respect to the exact nature of the plaintiff's investable assets, which complicates our inquiry of whether the court could characterize a rate of return that was based on the income earned by these assets as " 'the prevailing rate of return for secure investments'," per the definition of " 'ordinary rate of return' " found in *Weinstein* v. *Weinstein*, supra, 280 Conn. 770. Neither this court nor our Supreme Court thus far has established a procedure for a trial court to follow in selecting an ordinary rate of return to impute to a child support obligor's investment income. A trial court tasked with selecting a rate of return for imputed investment income purposes must

nonetheless be mindful of (1) the limits on its broad discretion in domestic relations matters and (2) the benchmark function of an imputed "ordinary rate of return," per the definition of that term in *Weinstein.* For the foregoing reasons, we agree with the defendant that the court abused its discretion by imputing a rate of return on his investment income that lacked evidentiary support.

D

*Defendant's Fourth Claim: Whether Court Erred in Not Allowing Defendant to Pay Part of His Support Obligation from Children's Custodial and Trust Accounts*

We now address the defendant's claim that the court erred by terminating articles 3.2 and 5.1 of the separation agreement. Again, article 3.2 provided that the defendant could use $15,000 per year per minor child from the minor children's custodial and trust accounts to pay part of his child support obligation, while article 5.1 provided that educational expenses in excess of $40,000 per year for two minor children were to be paid equally by the defendant and the custodial and trust accounts. The defendant specifically argues that none of the changes in circumstances found by the court affected the state or use of the custodial and trust accounts, and, therefore, the court abused its discretion by modifying his obligation to pay child support and educational expenses so that he could no longer pay part of his obligation from the accounts, even though the separation agreement expressly provided that he could do so. We agree with the defendant.

As previously noted in part I A of this opinion: "The power of the trial court to modify the existing order does not . . . include the power to retry issues already decided . . . or to allow the parties to use a motion to modify as an appeal. . . . Rather, the trial court's discretion includes only the power to adapt the order to some distinct and definite change in the circumstances or conditions of the parties." (Internal quotation marks omitted.) *Olson* v. *Mohammadu*, supra, 310 Conn. 673. We also reiterate that the undisputed changes in circumstances found by the court were (1) the increase in the defendant's assets and potential investment income due to the bonus in excess of $40,000,000 that he received in 2007; (2) the decrease in the plaintiff's assets from $23,438,810.18 to $15,407,123.42; and (3) the decrease in the amount of alimony received by the plaintiff due to the decrease in the defendant's "annual gross compensation from employment," which was the basis for the defendant's alimony obligation under the separation agreement.

The court did not address any of these changes in circumstances, however, when it modified the defendant's support obligation by terminating articles 3.2 and

5.1. It instead based its decision on the minor children's lack of representation during the dissolution proceedings, the lack of evidence before it regarding the specifics of the accounts, and its interpretation of the applicable regulations and statutes. None of these criteria bore on the amounts contained in the accounts, the manner in which the parties used the accounts pursuant to the separation agreement, or any circumstances that had changed since the dissolution judgment such that it would have been unjust or inequitable to hold the parties to articles 3.2 and 5.1. The court's only finding with respect to the accounts was that they held approximately $6,000,000 in September, 2010, despite the state of the economy between 2005 and 2010 and the parties' use of the accounts pursuant to the separation agreement.

Given these factors, we cannot conclude that the court properly exercised its discretion to terminate the support payments pursuant to articles 3.2 and 5.1 in the absence of any change in circumstances relating to the source of those payments. We accordingly determine that the court abused its discretion. Because we resolve the defendant's claim on the basis of our well established standards for modifications of child support obligations, we need not address the issue of first impression posed by the court of "[h]ow . . . the court [should] treat the minor children's estate and income in determining whether or not to modify child support, and, if so, what . . . the modified child support [should be]."

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other judges concurred.

[1] Even though Timothy became eighteen years old in January, 2011, the defendant's child support payments for him were still at issue when the court rendered its decision on March 29, 2011, because the court made its orders retroactive to January 16, 2010, a determination that neither party has challenged on appeal.

[2] The court and the defendant have different recollections of when the plaintiff first raised the issue of how the children's custodial and trust accounts should factor into any modification of the defendant's child support obligation. The court stated in its memorandum of decision: "On the last day of the hearings, after all the evidence was submitted and halfway through oral argument, counsel raised the issue: How should the court treat the minor children's estate and income in determining whether or not to modify child support, and, if so, what should be the modified child support?" The defendant stated during oral argument before this court that the issue "came up on October 28, [2010] when [the plaintiff] first filed her proposed orders." The plaintiff did not assert any valid legal ground for her request that the court eviscerate article 3.2.

[3] The defendant argues that we should apply a plenary standard of review because our Supreme Court held in *Maturo* v. *Maturo*, supra, 296 Conn. 88, that "[t]he question of whether, and to what extent, the child support guidelines apply . . . is a question of law over which this court should exercise plenary review." The defendant's claims, however, challenge the manner in which the court applied the guidelines, not the applicability of the guidelines or the extent thereof. The parties do not dispute that the guidelines governed the court's decision on the plaintiff's motion to modify child support. Accordingly, we apply an abuse of discretion standard of review.

[4] "General Statutes § 46b-86 (a) . . . provides in relevant part: 'Unless

and to the extent that the decree precludes modification, any final order for the periodic payment of permanent alimony or support . . . may, at any time thereafter, be continued, set aside, altered or modified by the court upon a showing of a substantial change in the circumstances of either party . . . .' " *Olson* v. *Mohammadu*, 310 Conn. 665, 671–72 n.3, 81 A.3d 215 (2013).

"As for child support orders, [§] 46b-86 (a) permits the court to modify child support orders in two alternative circumstances. Pursuant to this statute, a court may not modify a child support order unless there is first either (1) a showing of a substantial change in the circumstances of either party or (2) a showing that the final order for child support substantially deviates from the child support guidelines . . . . Both the substantial change of circumstances and the substantial deviation from child support guidelines' provision establish the authority of the trial court to modify existing child support orders to respond to changed economic conditions. The first allows the court to modify a support order when the financial circumstances of the individual parties have changed, regardless of their prior contemplation of such changes." (Internal quotation marks omitted.) Id., 672.

[5] General Statutes § 46b-84 (d) provides: "In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child."

[6] Even though the substantial change in circumstances portion of the court's judgment is not before us, we set forth the entirety of the standard of review for modifications of child support obligations in *Olson* because the substantial changes in circumstances found by the court necessarily impacted its subsequent modification of the defendant's child support obligations. This is because, pursuant to the aforementioned standard of review, a court's modification of a party's child support obligation must correspond to the substantial change in circumstances that it has found. This principle especially bears on our analysis in part III D of this opinion, in which we hold that the court erred because it modified a component of the defendant's child support obligation without first finding that there had been a substantial change in circumstances with respect to that component.

[7] Section 46b-215a-3 (b) (6) of the Regulations of Connecticut State Agencies provides in relevant part: "In some cases, there may be special circumstances not otherwise addressed in this section in which deviation from presumptive support amounts may be warranted for reasons of equity. Such circumstances are limited to the following . . . (D) Other equitable factors."

[8] Given our resolution of this claim, we need not address the defendant's subsidiary argument that the court erred in calculating the minor children's demonstrated housing needs because (1) it relied on amounts provided by the plaintiff that represented both her housing needs and the minor children's housing needs, and (2) the court's attempt to allocate the amounts between the plaintiff and the minor children did not account for the parties' intentions regarding or the plaintiff's own substantial pecuniary interest in the family home. We nonetheless address the argument for the reasons stated in the first paragraph of part III C of this opinion. We are not persuaded by the defendant's argument. The defendant provides no authority for any of his propositions regarding how the court should have calculated the minor children's housing needs. Furthermore, in reviewing a court's factual findings in a domestic matter, "[w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [W]e [instead] focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Internal quotation marks omitted.) *Muller* v. *Muller*, 43 Conn. App. 327, 338, 682 A.2d 1089 (1996). Given the court's use of the concepts of proportionality and simple division in the absence of "any legal authority . . . for allocating shelter expenses . . . between a parent, adult children and minor children," and the defendant's lack of objection to the comprehensive factual predicate for the calculation, we are unable to conclude that the calculation is legally incorrect or factually unsupported.

[9] General Statutes § 46b-87 provides in relevant part: "When any person is found in contempt of an order of the Superior Court entered under section 46b-60 to 46b-62, inclusive, 46b-81 to 46b-83, inclusive, or 46b-86, the court may award to the petitioner a reasonable attorney's fee and the fees of the

officer serving the contempt citation, such sums to be paid by the person found in contempt, provided if any such person is found not to be in contempt of such order, the court may award a reasonable attorney's fee to such person. . . ."

[10] Contra *O'Brien* v. *O'Brien*, 138 Conn. App. 544, 555, 53 A.3d 1039 (2012) (observing that "the ordering of attorney's fees is itself dependent upon the relative financial circumstances of the parties, as affected by the court's final financial orders," and holding that "the attorney's fees award here at issue must also be reconsidered in light of the new mosaic of financial orders that the court will issue on remand in this case"), cert. denied, 308 Conn. 937, 66 A.3d 500 (2013). The present case is distinguishable from *O'Brien* because we conclude for the reasons stated in this part III B of the opinion that any modification of the defendant's child support obligation would not impact the parties' financial circumstances in terms of their ability to pay their respective attorney's fees.

[11] General Statutes § 46b-62 provides in relevant part: "In any proceeding seeking relief under the provisions of this chapter and sections 17b-743, 17b-744, 45a-257, 46b-1, 46b-6, 46b-212 to 46b-213w, inclusive, 47-14g, 51-348a and 52-362, the court may order either spouse or, if such proceeding concerns the custody, care, education, visitation or support of a minor child, either parent to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. . . ."

[12] General Statutes § 46b-82 (a) provides in relevant part: "In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall hear the witnesses, if any, of each party, except as provided in subsection (a) of section 46b-51, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, [and] estate and needs of each of the parties  . . . ."

[13] The value of the plaintiff's assets is derived largely from holdings in various securities and brokerage accounts, which the plaintiff listed in her September 8, 2010 financial affidavit as totaling $12,549,102.93.

[14] Like the court in *Weinstein*, we express no opinion as to whether any of the rates of return found in "Federal Reserve Statistical Release H-15" is a proper ordinary rate of return to impute to a party's investment income for the purpose of calculating that party's child support obligations.